UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR 16 2015

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    MAR 16 2015

CLERK

No. 14-7159

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JIANQING WU, AND

ALL OTHERS SIMILARLY SITUATED,

Appellant,

v.

SPECIAL COUNSEL,

HIRE COUNSEL INC,

WILLKIE FARR & GALLAGHER LLP,

MORRISON & FOERSTER LLP, AND

ALTA LANGUAGE SERVICES INC.,

Appellees,

On Appeal from the Federal District Court
for The District of Columbia,
Civil Action No. 14-376(JEB)

(The Honorable James E. Boasberg, Judge)

# APPELLANT'S BRIEF

Jianqing Wu, Appellants
3304 Rutgers Street
Hyattsville, MD 20783
jwu9999@gmail.com
202-459-9199

## TABLE OF CONTENTS

Page

Table of Contents ................................................2

Table ofAuthorities .............................................4

Preface .........................................................5

Renewal of Procedural Motion.....................................5

Jurisdictional Statement........................................5

Statement of Issues Presented For Review........................5

Court Decisions For Review......................................6

Statement of the Case and Facts.................................7

Summary of Argument ............................................10

Argument.......................................................11

    A.  ALTA Tests Are Administered in Violation of <u>Griggs</u> Rule and Thus Should Be Enjoined ................................11

    B.  Statistical Method Is Invalid Proof of Disparate Impact of ALTA Tests That Are Administered in Small Batches in Uncontrolled Environment......................................13

        1. Six Fatal Flaws In Applying <u>Castaneda's</u> Random-drawing Model to Employment Cases .........................14

        2. <u>Teamsters</u>, <u>Hazelwood</u> and <u>Mayor</u> All Rejected the Use of Statistical Disparity Proof in Cases Involving A Small Number of Special Candidates......................17

        3. Statistical Proof Has No Utility For Proving Discrimination, but Has Serious, Unpredictable, and Random Effects on All Parties.......................22

        4. Pleading Rule Constructed by Extending <u>McDonnell Douglas</u> to <u>Mayor</u> Is Consistent with All Supreme Court's Cases, Title VII, and Employment Realty............29

    C. Using ALTA Test Scores to Select Foreign Document Reviewers Has a Definite Impact of Eliminating Native Speakers, As Shown by Simulation.............................................30

    D.  Using ALTA Test Scores to Select Foreign Language Reviewers Has Definite Adverse Impact on Old-and-Experienced Reviewers, As Shown by Simulation..................................35

Conclusion.......................................................37
Certificate of Compliance with Font Requirement...................38
Certificate of Service...........................................39

5

10

15

20

25

30

35

**TABLE OF AUTHORITIES**

**Cases**                                                           **Pages**

1. Castaneda v. Partida,

   430 U. S. 482 (1977)......................................... 14

2. *[1]Griggs v. Duke Power Co.,

   401 U.S. 424 (1971)...............................................11

3. *Hazelwood School District v. United Slates,

   433 U.S. 299 (1977)............10-11, 14, 16-18, 20-21, 26-27, 29-30

4. *McDonnell Douglas Corp. v. Green,

   411 U.S. 802 (1973).........................................10, 29

5. *Mayor v. Educational Equality League,

   415 U.S. 605 (1974)..............................10, 14, 17, 21, 29

6. Ricci v. DeStefano,

   557 U.S. ___, ___, 129 S.ct. 2658, 2678 (2009)...................13

7. Teamsters v. United States,

   431 U.S. 324...............................................14, 17-18

8. Young v. Covington Burling LLP,

   736 F. Supp.2d 151 (D.D.C. 2010)................................13


**Statutes and Other Legal Authorities**                         **Pages**

42 U.S.C. §2000e-2,

Title VII of the Civil Rights Act of 1964.....................10,11


**Other Authorities**                                             **Pages**

   None............................................................

---

[1]  Authorities upon which Appellant chiefly relies are marked with asterisks.

## PREFACE

In this Brief, Appellant, Jianqing Wu, will be referred to as Wu. The following symbols will be used in Appellant Brief: (CP) -- Amended Complaint.

5                      **RENEWAL OF APPELLANT'S MOTION**

Appellant, the Plaintiff below, in a procedural motion requested for a large briefing period for inviting parties to submit their Amicus Curiae briefs. Appellant's extended research in disparate impact cases and the initial efforts of developing a proposed pleading rule have
10   consumed a considerable amount of time. In considering Title VII, the repeated warnings of United States Supreme Court about the use of sta-tistical proof, and employment reality, Applicant now asks this Court to bar the use of statistical proof completely and apply a new pleading rule in employment cases. Due to the potential impact of proposed
15   pleading rule on Title VII in the nation, this Court may need to invite law enforcement agencies to submit their briefs. Upon the filing of this brief, Applicant will invite EEOC, DOJ Civil Right Division, some U.S. senators, some U. S. House Representatives, and potential public interest organizations to file their briefs. Plaintiff is not sure who
20   will submit briefs. Unless this Court can decide all issues solely on the parties' briefs, it should reconsider Appellant's motion to appoint Amicus Curiae to file their briefs.

### FEDERAL QUESTION JURISDICTION

This Court has an appellate jurisdiction over a claim raising fed-
25   eral-question jurisdiction because the complaint raises federal ques-tions under Title VII of The Civil Right Act and Age Discrimination in Employment Act. 29 U.S.C.

This Court has an appellate jurisdiction over the appeal arising from claims which support ancillary and supplemental jurisdiction over
30   the state law claims against ALTA because the state law claims are part of the federal case.

### STATEMENT OF ISSUES PRESENTED

Does Title VII bar the use of a private employment test that was statically invalid in design, clearly bias, uncontrolled, and fraud-
35   prone, as a controlling factor in selecting employees?

Does a disparate impact claim arising from a private employment test require statistical disparity proof, when impartial statistical data even did not exist and the statistical model is fatally flawed?

Does plaintiff have a national origin-based disparate impact claim
5   arising from an employment test practice when defendants replaced required native language skills with frivolous ALTA language test scores that depend on applicants luck, deception, and persistence, and test bias?

Does plaintiff have an age-based disparate impact claim arising
10  from an employment test practice when defendants replaced the most relevant review experience of foreign language document reviewers with frivolous ALTA language test scores that were essentially a product of luck, incompetency, and deception?

**TRIAL COURT'S DECISIONS FOR REVIEW**

15      In the ruling under review is the decision entered on July 15, 2014 dismissing the complaint without prejudice and its ruling denying Plaintiff Motion for Reconsideration dated September 12, 2014.

The trial court did not address many issues which were raised by Defendants and countered by Plaintiff, but found that Plaintiff's own
20  allegations "sinks" his own case. The trial court conducts a series of analysis and found that there as no national origin discrimination and no age-based discrimination. The decision, which could not plausibly square with reality, reveals that the trial court did not correctly apply the law on disparate impact analysis, the rationale of using sta-
25  tistical data, and did not even analyze nearly all alleged facts. The trial court did not even discuss the central fact, the ALTA test. Nor did the court even attempted to ascertain population racial composition, actual racial composition, and determining the impact of a challenged employment practice on racial composition. Naturally, the trial
30  court did not address how to conduct disparity analysis for private employment in a relatively new e-discovery.

The trial court incorrectly uses an equal representation. The trial court ignored reality that foreign language document review is a highly specialized job.

35

### STTEMENT OF THE CASE AND FACTS

The claim is to challenge the employment test that is used to se-
lect document reviewers in e-discovery. Some staffing agencies, a small
number of law firms, and some managed review companies worked out a
5  common foreign language reviewer selection standard that requires re-
view candidates to take an online uncontrolled short language test ad-
ministrated by defendant ALTA Language services Inc., and the staffing
agencies and/or law firms then use "scores" as a determinate factor in
selecting reviewers.

10     Plaintiff soon realized that this practice is an attempt to re-
place native language skills by ALTA test scorers. To stop this dis-
criminatory practice, Plaintiff filed complaint with Equal Employment
Commission, alleging ALTA tests had a discriminatory impact to native
speakers in violation of Title VII. The EEOE did not act, but issued
15  right-to-sue letters. Plaintiff brought this action against named staff
agencies, named law firms, and ALTA in the Federal District Court for
the District of Columbia. All five defendants filed motion to dismiss
on various grounds, and the trial court dismissed the case without
prejudice. After Plaintiff's motion for reconsideration was denied,
20  Plaintiff took this appeal.

Plaintiff is a native Chinese speaker and holds four degrees:
B.S., M.S., Ph.D. and J.D. Plaintiff was a member of DC bar, NY bar li-
cense, and a Patent Bar (CP ¶18). Plaintiff has reviewed documents and
started studying discovery problems since 2000. Plaintiff has extensive
25  case experience, extensive review-platform experience, Mandarin native
fluency, and solid technical background (CP ¶18).

1. Two ALTA Test Instances in 2009

On or about July 11, 2009, Plaintiff applied to Ajilon for a
Mandarin review project of law firm Willkie Farr (CP ¶21-23). For the
30  first time, Plaintiff, a native speaker of Chinese, was asked to take
ALTA's "Advanced Chinese Reading Test" and achieved 75% (CP ¶22).
Willkie required 90% as the passing point. Therefore, Plaintiff's em-
ployment application was rejected (CP ¶23). Ajilon and Special Counsel
merged, resulting in new Special Counsel. After the merger, Special
35  Counsel stopped communicating with Plaintiff and placed Plaintiff's

name in its blacklist (CP ¶¶33, 38), which continues injuring Plaintiff (CP ¶¶34, 37). Special Counsel continued to use the same test policy as March 20, 2014 (CP ¶37) and continued to seek reviewers from those who do not even speak Mandarin (CP ¶32).

5    Plaintiff was registered with Hire Counsel at least as early as 2007, and Plaintiff had a decisive technical advantage in reviewing cases involving technical matters (CP ¶39). On or about October 1, 2009, Plaintiff applied to Hire Counsel for a Mandarin Review Project of law firm Morrison and Foerster (CP ¶41). Plaintiff was asked to take
10   "Mandarin Advanced Reading Test". Plaintiff got same score (75%) for possibly the same test (CP ¶43). Hire Counsel stopped communicating with Plaintiff. Hire Counsel removed Plaintiff from its recipient list for distributing routine job announcements by email.

     While placing Plaintiff in their blacklists, those defendants rou-
15   tinely seek new applicants to fill their openings (CP ¶¶51-52). A job announcement published around April 9, 2014 reveals Hire Counsel's pol-icy: "Hire Counsel does language testing on all candidates." (CP ¶¶51-52)

     2. The Fundamental Flaw of ALTA tests

20   Plaintiff alleged that ALTA lacked credential as test administra-tor (CP ¶¶75-81); tests were created by translating other tests (CP ¶74); tests were never validated and tested (CP ¶77-78); each test was reused for a long period of time in an uncontrolled environment and test sites were not monitored (CP ¶67); test subjects were not designed
25   for specific jobs which require different vocabulary and knowledge (CP ¶65); tests were statistically invalid (CP ¶83-85); and there were a dozen ways of cheating (CP ¶87). Anyone can get a good score in one test would be able to get a similar score in any other languages (CP ¶87d). Plaintiff cited many reported fraud instances (CP ¶87, a-i).

30   The disparate impact on native speakers arises because the test-ing (1) insulted native speakers in a way similar to demanding American English speakers attorneys to pass an English test created by a second language speaker who knows little English (CP ¶91); (2) increased the employee candidate pool size by including otherwise unqualified and il-

literate candidates (CP ¶91b); (3) forced native speakers to partici-
pate in fraud or give up jobs (CP ¶91c);(4) forcing native speakers to
joining test like a drawing method (CP ¶91d); and (5) provided incen-
tive to whoever is willing to commit test fraud.

5      It is bias against native speakers because the tests were creat-
ed by translating a common test in another language (CP ¶¶99, 101); the
test contains "inaccurate, misleading, confusing, erroneous materials
as a result of context change and translation errors (CP ¶74); and the
low design quality distorted true language qualifications, promoted
10 mass fraud, and created a fraudulent competitive environment which fa-
vors non-native, inexperienced, less qualified, and mismatched review-
ers. The tests failed native speakers in many languages with high
chance (CP ¶¶72-74).

The test is also bias against old candidates when relevant experi-
15 ence is replaced by ALTA test scores because the scores do not factor
in the most relevant experience of old candidates.

3. Continuing Adverse Impacts of Defendants Blacklists

The named staffing agencies continue to maintain the blacklists
containing Plaintiff name. They presumably and actually continued to
20 exclude Plaintiff from all Mandarin review and English review jobs. By
a competitive mechanism, defendants' conduct forced other staff agen-
cies to use the same test and caused other staffing agencies to black-
list Plaintiff. Moreover, when Plaintiff is blacklisted for foreign
language review, Plaintiff will also be prevented from getting English
25 review jobs (CP ¶38). The impact cannot be measured by one application,
several applications, but may be in tens of applications and potential-
ly hundreds. The defendants and those following the same policy may
rather select applicants who did not have the required language skills
and technical skills for reviewing documents originated from China.

30      In this appeal, Plaintiff requests this Court address only the
issues that have been decided by the trial court. Due to complexity of
this case, this Court should not decide any issue that has not been
fully briefed below. The original brief is nearly 70 pages, but shorted
due to page limit.

**Summary Argument**

The <u>Castaneda</u> statistical model is totally wrong when it is used
5 in employment cases. All required assumptions, large sample/constant
fixed drawing probability, random-drawing method, and drawing indepen-
dence, do not hold. The misapplication of a totally wrong statistical
model was further compounded with practical difficulties: non-existence
of true population racial composition, wrong standard deviation, and
10 very small sample size. The statistical method lacks ANY utility for
proving or disproving disparate impact due to its use of circular and
self-contradictory logic, and its selection model is totally contrary
to the competitive selection model in employment. The liability deter-
mined by statistical model would even depend upon what non-party resi-
15 dents, entities and governments do, write, and think in the hiring lo-
calities. The unpredictable effects of inaccurate population racial
data and the systematic effects of yes-and-no categorization have re-
sulted in unpredictable results, making Title VII unenforceable.

In the instance case, the trial court's requirement of a statis-
20 tical disparity is contradictory to <u>Griggs</u>, <u>Mayor</u>, <u>Teamster</u>, and <u>Hazel-
wood</u>. In the e-discovery industry, impartial statistical data are un-
available and valid statistical proof is impossible. Thus, the trial
court's requirement of statistical proof is same as granting absolute
immunity to Title VII violators and nullifying Title VII. By applying
25 <u>Mayor</u>, <u>Teamster</u>, and <u>Hazelwood</u> analysis, preference of foreign language
reviewers should be determined by evaluating candidates' relevant qual-
ifications. When the two most relevant job skills - review experience
and foreign language skills are replaced by ALTA test scores which pri-
marily reflect deception, bias, luck, and incompetency, adverse impacts
30 on experienced and skillful reviewers are definite, and can be proved
by simulation. The trial court's finding of no disparity impact on
old/experienced and skillful candidates is contrary to employment real-
ty.

Plaintiff asks this Court to extend <u>McDonnell Douglas</u> pleading
35 rule as modified by <u>Griggs</u> and <u>Mayor</u>, resulting in fully workable

pleading rule that properly addresses the concerns in <u>Teamster</u> and <u>Hazelwood,</u> and is fully consistent with all relevant precedents, Title VII, and employment reality.

Argument

5    **A. ALTA Tests Are Administered in Violation of <u>Griggs</u> Rule and Should be Enjoined.**

An earliest case regarding employment test was decided in <u>Griggs v. Duke Power Co</u>. 401 U.S. 424, 436 (1977). In this case, the plaintiff brought an action, pursuant to Title VII of the Civil Rights Act of

10   1964, challenging Defendant's requirement of a high school diploma or passing of two professionally prepared aptitude tests as a condition of employment in or transfer to jobs at the plant. None of the tests is shown to bear a demonstrable relationship to successful performance of the jobs for which it was used. Both were adopted without meaningful

15   study of their relationship to job performance ability. The Supreme Court held:

> ".....What Congress has forbidden is giving these devices and
> mechanisms controlling force unless they are demonstrably a
> reasonable measure of job performance.... Far from disparag-
20 > ing job qualifications as such, Congress has made such qual-
> ifications the controlling factor, so that race, religion,
> nationality, and sex become irrelevant. What Congress has
> commanded is that any tests used must measure the person for
> the job, and not the person in the abstract. <u>Griggs,</u> 401
25 > U.S. at 436.

As alleged, ALTA testing fails to meet every requirement stated in <u>Griggs</u>. Defendants can never show how such an uncontrolled test can measure job performance; the tests are given a controlled force such as

30   passing grade, highest scores, and preference ranking. It is unrealistic idea that a brief test of 15 to 30 questions can somehow measure candidates' language skills and job performance. Native language skills can vary dramatically from person to person. There is no way to compare language skills among lawyers, doctors, engineers, and philosophers.

35   ALTA test was a money game. This Court should note that native language ability cannot be rated by administrating a brief language test. There is no rational basis to make inference from a tiny tested knowledge to a person's language knowledge. There are fundamental differences between a school course test and the ALTA test. In school

tests, there is a knowledge space while ALTA tests do not have any de-
fined knowledge scope.

    Griggs requires that employers select employees solely by their
qualifications and employment test be "demonstrably a reasonable mea-
5  sure of job performance", and must measure the person for the job, but
not the person in abstract. The ALTA testing violates the Griggs rule
allowing permissible employment tests.

    In Griggs, the defendant did not use the two tests as means to
raise qualifications, but to replace the basic qualifications with ir-
10  relevant qualifications. The employer used passing score as a condition
for transferring candidates from Labor department to other four operat-
ing departments, and the tests would favor candidates who are of liter-
acy but did not have basic skills for performing daily job tasks. When
the test scores are used with a controlling effect, it posed a risk of
15  disqualifying candidates who possessed best basic skills for performing
the jobs, and the employer may have to select candidates who lack basic
skills for performing job functions. This Court should see Griggs ra-
tionale to prohibit employers from manipulating job qualifications to
achieve discriminatory purposes.

20    When employers tried to substitute necessary qualifications by bo-
gus, exaggerated, non-relevant, or tenuously relevant qualifications
while ignoring the basic language skill and legal skills, their prac-
tice does not advance employers' interests.

    Griggs is a controlling law because it addresses substantially the
25  same question. The challenged test had controlling effects, test ques-
tions had not been validated, and the tests were designed to test per-
sons in abstract, but not test persons for jobs. This Court can summar-
ily find that the ALTA testing is in invalid for (1) violating a uni-
versal consensus that native language skills cannot be tested; (2) con-
30  taining a small number of questions making statistically invalid; (3)
being bad writing due to translations; (4) failing to pass pretest-val-
idation; (5) reusing each test version for a long time in an uncon-
trolled environment; (6) failing to monitor test sites, and (7) failing
to use language tests developed in a native culture.

35    From the above findings, this Court can infer further that test

scores would depend on how test materials are selected and luck and cheating were two major components of scores. By using such tests, employers inevitably get an increased population of deceptive, incompetent, unethical and lucky candidates while rejecting honest, competent,
5   ethical, and hard-working candidates.

The challenged tests should be enjoined for public interest. When e-discovery attorneys are selected by such a method, the defendants inevitably get worse employees. This employment method imposes unreasonable risks to end clients. When selected foreign language reviewers
10  cannot read foreign language documents, use Google translate or highlighted words and subject lines to make a guess, it directly compromises federal enforcement actions such as meager clearance, export violation investigation, and foreign-corrupt practice investigation. The flawed qualification standard used in e-discovery has damaged the foun-
15  dation of justice and even can affect the business in front of all federal courts. The ALTA language tests, if they are evaluated by native language experts, would become laughingstock and discredit federal enforcement actions against foreign parties. The public has a great interest in stopping this scandal.
20  **B. Statistical Method Is Invalid Proof of Disparate Impact of ALTA Tests That Are Administered in Small Batches in Uncontrolled Environment with Insulting Effects on Native Speakers.**

The Court of Appeals for DC Circuits has decided a series of cases with holdings that disparage impact can be proved by statistical data,
25  as interpreted by trial courts. In Young v. Covington Burling LLP, 736 F. Supp.2d 151 (D.D.C. 2010), the trial court cited United States Supreme Court cases: "[A] prima facie case of disparate-impact liability" is established by "a threshold showing of a significant statistical disparity . . . and nothing more." Ricci v. DeStefano, 557 U.S. ___,
30  ___, 129 S.ct. 2658, 2678 (2009). Ricci means that statistical disparity alone without additional proof is sufficient to make out a prima facie disparate impact case. The language cited in Young is intended to pose a lowest pleading threshold when it said "nothing more." Young primarily concerns statute of limitation of disparate impact claim and
35  it presents no factual pattern for determining whether statistical proof is a requirement, and actually allowed at least one disparity

claim.

The trial court held that statistical disparity is a requirement in the ruling on Plaintiff's motion for reconsideration. The trial court avoided addressing three inconvenient precedent Mayor v. Educa-
5    tional Equality League, 415 U.S. 605 (1974) that Plaintiff cited in his original opposition. In taking this position, the trial court "followed" a legal rule that does not exist and demands a proof which was impossible.

**1. Six Fatal Flaws When Castaneda Model Is Used in Employment Cases**

10    Teamsters v. United States, 431 U. S. 324, 360, noted the use of statistical disparity for making out a prima face case. Hazelwood School District v. United Slates, 433 U.S. 299, n. 14, the court stated "A method of measuring the significance of such statistical disparities was explained in Castaneda v. Partida, 430 U. S. 482, 430 U. S. 496-
15    497, n. 17." Plaintiff shows that this Castaneda model is a wrong model for employment cases for six different reasons.

The statistical method used in Castaneda involves calculation of the "standard deviation" as a measure of normal fluctuations from sample. The subject matter discussed in Castaneda is the selection of ju-
20    rors, which is fundamentally different from employment. A general approach used in statistic analysis is to place a challenged employment practice in a distribution which would tell how likely the employment practice has no impact on racial composition. A court uses two to three standard deviations as a measure.

25    The Castaneda model has the following fatal flaws when it is used in employment cases: (1) the random drawing method is inapplicable to employment, (2) true population racial composition cannot be determined in real world, (3) the standard deviation estimated for binomial distribution is an unrealistic estimate of normal fluctuation of racial
30    composition in the real world, (4) the statistical model has no utility to determine discriminatory causes, and even a disparate impact suggested by observed data is a well known flaw, (5) pooling data from small hiring batches can also alter statistical disparity proof, and (6) two classification effects results in unpredictable liabilities.

Castaneda statistical model was based on binomial distribution. It was based upon N drawings, each to get one outcome at p probability or get opposite outcome at q=(1-p) probability. When a drawing trial is conducted to get distribution data, each drawing is obviously indepen-
5   dent of prior drawing. When this model is used to study racial composi-
tion, the required conditions can be satisfied if total data number is sufficiently large that drawing each item would not affect the proba-
bilities of drawing a subsequent item. This model may be reasonable for drawing jurors if the candidate pool is very large.

10      When Castaneda model is extended to employment, all assumptions fail. First, an employer normally hires only one to several employees, and the employer may select initial candidates which are three to four times of intended hiring number for interview and then determines the final employees. In the first phase of selection, if the employer se-
15  lects one candidate in any race, it would reduce the chance to get a candidate of the same race from the reduced pool. In the second phase selection, the selection has the same problem. In both phrases, the em-
ployer selects most qualified candidates by weighting their competi-
tiveness. Table 1 shows the drawing probabilities for a juror case and
20  an employment case.

Table 1. The Effects of Each Drawing on Subsequent Drawing

|  | Drawing | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|---|
| Case A | Outcome | D | D | M | D | D | D | M | D |
|  | p | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
|  | q=1-p | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| Case B | Outcome | D | M | D | D | D | M | D | D |
|  | p | 0.25 | 0.29 | 0.17 | 0.2 | 0.25 | 0.33 | 0 | 0 |
|  | q=1-p | 0.75 | 0.71 | 0.83 | 0.8 | 0.75 | 0.67 | 1 | 1 |

In Case A, eight individuals are drawn from an extremely large population or by flipping a coin. Case B is for drawing eight individu-
als from a small pool comprising 2 minority members (M) and 6 dominant or majority members (D). p is probability for drawing minority and q=(1-p) is probability for drawing a dominant-racial member.

In employment case B, the frequencies for drawing minority or ma-

jority members are affected by each prior drawing. A general observa-
tion is that whenever a minority is drawn, the probability of drawing a
minority in next drawing is reduced or constant. If a majority is
drawn, the probability of drawing a majority member in next drawing is
5    reduced or constant. For a set of outcomes, the drawing probabilities
could look like (0.25, 0.29, 0.17, 0.20, 0.25, 0.33, 0, 0). The data
demonstrate that binomial distribution is inapplicable to small employ-
ment data. All key assumptions – fixed drawing probability, and drawing
independence, used in Castaneda's statistical model fail.

10       If the candidate pool is sufficiently large, and employees are se-
lected by putting each candidate name in a ball, placing all balls in a
lottery machine, and blowing N balls out of the machine, the Castaneda
model might have merit. Nearly all employers use two to multiple phras-
es competitive selection methods. When the statistical model was gradu-
15   ally extended from a Yes-or-no binomial distribution to jurors-drawing,
truck driver hiring, school teachers hiring, and firefighter hiring, it
gradually becomes junk science.

         This is not the only flaw. Castaneda statistical analysis is based
upon transformation of binomial distribution. To draw N individuals
20   from a binomial distribution, each drawn individual may be of outcome D
or outcome M at same fixed drawing probabilities. If drawing sample
size N is sufficiently large, the repeated drawing of samples of the
same size N would generate a normal distribution, with E=p*N and stan-
dard deviation = $(N*p*(1-q))^{(1/2)}$. It is with this distribution that
25   the court considers how likely an observed hiring composition can hap-
pen by fluctuation.

         All flaws, including unknown true population probabilities,
fluctuating drawing probabilities, and drawing independence find their
ways into this transformed distribution. In addition, the additional
30   requirements for making valid transformation cannot be met.

         The fatal model flaw is not only problem, Castaneda requires "pop-
ulation" racial composition, which should be racial composition comput-
ed from all residents who are qualified and willing to work. As demon-
strated in Hazelwood, this parameter does not exist in real world, and
35   the court had to use a substitute racial composition with a great risk

of error.

Moreover, the standard deviation for a large sample from a true binomial distribution cannot be used to measure actual fluctuations in employment case. The standard deviation $SD=(N*p*(1-q))^{(1/2)}$ used in

5  Castaneda is not a value from actual drawing trial, but is based upon the drawing for binomial distribution. This standard deviation is not a valid estimate for employment fluctuations. This flaw can be found by consider what affect the selecting fluctuation. The standard deviation depends upon only two drawing probabilities and drawing size. The Court

10  should see, by common sense, that a large number of social and demo-graphic factors ("fluctuation-contributing factors") can affect actual racial composition fluctuation.

By imagination, fluctuation-contributing factors include racial geographic distribution, differences in distributing recruitment infor-

15  mation, differences in skills of different racial groups for seeking jobs, difference in motivations of different racial groups for seeking jobs, and differences in races groups in responding to recruitment process, and things that might affect the incentive of minority members to seek jobs in a locality. Each of the classes of factors may comprise

20  a large number of sub-factors which are often unknown.

As shown in Hazelwood, a special effort St Louis to recruit minor-ity members increased the minority composition in work force. It af-fects population racial composition (the area's data in Hazelwood). This geographic preference must also affect the actual standard devia-

25  tion. Thus, actual standard deviation would be different from case to case even for an identical hiring number. It is impossible to determine actual standard deviation by trial in employment cases (see further analysis below).

**2. Teamsters, Hazelwood and Mayor All Rejected the Use of Statistical**
30  **Proof in Cases Involving a Small Number of Special Candidates.**

All assumptions used in the Castaneda statistical model fail to hold when the model is applied to employment cases. The Supreme Court knew it. In Teamsters v. United States, 431 U. S. 324, 341, the court stated: "We caution only that statistics are not irrefutable; they come

35  in infinite variety and, like any other kind of evidence, they may be

rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances. See, e.g., Hester v. Southern R. Co., 497 F.2d 1374, 1379-1381 (CA5).[emphasis added]" Id. 340. In Teamsters, the Supreme Court did not use gross statistical data, statistical dispari-
5 ty, and standard deviation.

The Supreme Court in Hazelwood cited the same statistical model in Castaneda. It then stated "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will, in time, result in a workforce more or less representative of the racial and ethnic
10 composition of the population in the community from which employees are hired. Evidence of long-lasting and gross disparity between the composition of a workforce and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a workforce mirror the general population." Id. at 431
15 U. S. 340 note. 20. While Hazelwood court did not provide other useful method of proof, its analysis is equivalent to pointing out many fatal flaws. In Hazelwood, the government charged Hazelwood with employment discrimination in hiring teachers. The key employment data are shown in the following table.

20 Table 2. Analysis Summary for Hazelwood Hiring Data and Area Hiring Data

| Year | (M/D) Ratio | N | Exp. M | Actual M | S.D. | Impact |
|------|-------------|-----|--------|----------|------|--------|
| 72-73 | 15.40% | 282 | 43.43 | 10 | 6.06 | 5.51 |
| 73-74 | 15.40% | 123 | 19.94 | 5 | 4 | 3.48 |
| Subtotal | 15.40% | 405 | 62.37 | 15 | 7.26 | 6.52 |
| 72-73 | 5.70% | 282 | 16.07 | 10 | 3.89 | 1.56 |
| 73-74 | 5.70% | 123 | 7.01 | 5 | 2.57 | 0.78 |
| Subtotal | 5.70% | 405 | 23.09 | 15 | 4.67 | 1.73 |

Note: M = Minority Number; N = total hired number; S.D = Standard Deviation; and Impact = adverse impact measured by S.D.

The court in Hazelwood stated "What the hiring figures prove obvi-
25 ously depends upon the figures to which they are compared." The issue there is whether the racial composition 15.4% or 5.7% should be used for determining disparity impact. Government urged the court to use population racial composition 15.4% for both St. Louis County and the

city of St. Louis. If this population composition was used, the govern-
ment would satisfy the 2 to 3 standard deviations requirement. In con-
trast, the petitioners urged the court to exclude composition data for
St. Louis because it made special attempts to maintain a 50% black
5  teaching staff. The percentage of black teachers in the relevant labor
market in St. Louis County alone in 1970 would be 5.7%, rather than
15.4%. By using this population racial composition, the disparate im-
pact would be only 1.56, 0.78, 1.73 standard deviations.

        The court remanded the case with instructions for the district
10 court to determine "(i) whether the racially based hiring policies of
the St. Louis City School District were in effect as far back as 1970,
the year in which the census figures were taken; [Footnote 18] (ii) to
what extent those policies have changed the racial composition of that
district's teaching staff from what it would otherwise have been; (iii)
15 to what extent St. Louis' recruitment policies have diverted to the
city, teachers who might otherwise have applied to Hazelwood; [Footnote
19] (iv) to what extent Negro teachers employed by the city would pre-
fer employment in other districts such as Hazelwood; and (v) what the
experience in other school districts in St. Louis County indicates
20 about the validity of excluding the City School District from the rele-
vant labor market."

        The statistical method is nothing more than a "dummy routing de-
vice" which would produce different outcomes by feeding different data.
Selecting different population racial composition data would lead to
25 different results. In essence, the disposition of the case really de-
pended upon what the district court would find from the analysis of
discriminatory policies and the conduct of others in the community.
Hazelwood is equivalent to a holding that uncontrolled population data
cannot be used for statistical analysis and valid analysis must go back
30 to employment policies.

        Many fluctuation-contributing factors, which are not included in
the standard deviation, may cause hiring data to depart from hypotheti-
cal population racial composition. When more knowledge and more skills
are required in employment, the farther away are the assumptions from
35 the employment reality. Hazelwood did not point out the fact that the

theoretical standard deviation bears remote relevance to the racial
composition data, and the pooling of small hiring data from different
hiring batches also invalidate the assumptions used in the model.

       Due to statistical model's inability to prove discriminatory
5  cause, Hazelwood was decided by circular logic: (1) the court requires
that plaintiff show a statistical disparity; (2) since the outcome of
statistical analysis depends upon how the challenged racial composition
data and population racial composition data are collected, it is neces-
sary to analyze facts such as preexisting racial composition, discrimi-
10 natory polices, and minority's migration desire; (3) using the result
of policy analysis, the court determines how to formulate the popula-
tion racial composition data for use in Castaneda model; (4) based upon
whether the disparity is more than 2 to 3 standard deviations, the
court determines whether a disparity impact legally exists. Ignoring so
15 many FATAL flaws from the misapplication of the Castaneda model, the
case is actually decided on the result of analyzing discriminatory
policies and all related facts. Hazelwood must be read as a rejection
to statistical proof because it is the discriminatory policy analysis
but not statistical analysis that proves or disproves disparate impact.
20 Castaneda worked as a calculator. Its sole residual effects, which will
be discussed blow, is to inflict gross injustice to true victims or
grant windfall gain to undeserved class members.

       Hazelwood also reveals the fatal flaw that statistical popula-
tion's racial compositions simply did not exist. Hazelwood correctly
25 acknowledged that general population racial composition was not the
general population. A truly valid statistical population's racial com-
position is not the racial composition in the hired teachers either,
but are all available and job-seeking residents who have required qual-
ifications. Such data do not exist in the real world and cannot be ac-
30 quired. Thus, the court had to use the closest racial composition of
the hired teachers in a relevant area as an estimate of the population
racial composition. Hazelwood made a bold and probably wrong assumption
that the racial composition in the relevant area does not have racial
bias.

35       If the racial composition of the hired teachers in the relevant

area is bias or incomplete for whatever reasons, what <u>Hazelwood</u> could
determine is whether Hazelwood's employment practice has more or less
disparate impact than the area's general practice. Even more strangely,
Hazelwood liability would depend what was done in other surrounding
5  communities. This is not Title VII intended to address. <u>Hazelwood</u> is a
perfect example of showing how difficult to find valid population
racial data. The argument against the inclusion of St. Louis hiring
data precisely proves this flaw. There are unlimited other unknown pos-
sibilities.

10      The supreme court in <u>Hazelwood</u> knew some problems and provided an
exception (see the footnote 13) for cases involving special qualifica-
tions, when it stated: "The comparative statistics introduced by the
Government in the District Court, however, were properly limited to
public school teachers, and therefore this is not a case like <u>Mayor v.</u>
15  <u>Educational Equality League</u>, 415 U. S. 605, in which the racial compo-
sition comparisons failed to take into account special qualifications
for the position in question. <u>Id</u>. at 415 U. S. 620-621." While <u>Hazel-</u>
<u>wood</u> knew the problems, it did not appreciate the seriousness of the
model failure. Finding teachers who can TEACH and finding truck drivers
20  who are SAFE are FAR more than flipping a coin and comparing applicant
resumes. The court's repeating warning should be construed as an invite
for developing a new pleading rule to save Title VII.

    Disparity impact claim arising from employment involving special
qualifications had been considered by the Supreme Court before <u>Hazel-</u>
25  <u>wood</u> was decided. In <u>Mayor v. Educational Equality League, 415 U. S.</u>
<u>605</u>, the court rejected statistical proof by the following language:

    "....At least with regard to nine seats on the Panel and assum-
    ing, arguendo, that percentage comparisons are meaningful in a
    case involving discretionary appointments, the relevant uni-
30  verse for comparison purposes consists of the highest ranking
    officers of the categories of organizations and institutions
    specified in the city charter, not the population at large....
    Furthermore, the District Court's concern for the smallness of
    the sample presented by the 13-member Panel was also well
35  founded. The Court of Appeals erred in failing to recognize the
    importance of this flaw in straight percentage comparisons. Id.
    415 U. S. 621-622."

    The three points addressed in <u>Mayor</u> are directly relevant to

the issues on this appeal. First, for a special job in foreign lan-
guage review, relevant population is not the general population,
not those who are actually hired, but only those who actually have
necessary qualifications and skills and are available to apply.

5  Second, the court by implication rejected statistical proof for any
cases where hiring employees are in small sizes. Third, the court
rejected "straight percentage comparisons." Obviously, normal hir-
ing fluctuation makes straight percentage comparisons meaningless.
Mayor's concern is also consistent with §703(j) of the Act, 42

10 U.S.C. § 2000e 2(j), which specifically states that hiring racial
composition does not have to be consistent with the racial composi-
tion in a population.

**3. Statistical Proof Has No Utility for Proving Discrimination, but Has
    Serious and Unpredictable Effects on All Parties.**

15     As a basic scientific principle, statistical analysis IS NEVER
intended to as proof of any cause. It is only a method for ascertaining
an effect of a treatment on a sample of population with normal fluctua-
tion. A reason for using statistical analysis is that static racial
percents cannot be used to prove or disprove discriminatory effects be-

20 cause hiring racial composition is a random variable.

(a) Statistical Proof Uses Circular and Self-Contradictory Logic

    In normal statistical analysis, a known treatment is applied to
test subject and a blank is used as a control. Normally, some possible
mechanism is known or proposed about the treatment, and a statistical

25 analysis is then conducted to determine whether the treatment's effect
is sufficiently certain to reject the null hypothesis. Statistical
method does NOT prove any cause. A "significant difference" can be
found for any two things. What a statistical analysis does is whether
the measured quality is sufficiently different from baseline by normal

30 fluctuation that the effect under investigation is certain.

    Even though the statistical disparity proof used in Hazelwood does
not expressly require significant tests or hypothesis tests, the use of
standard deviation to ascertain adverse impact is similar to the ratio-
nale used in hypothesis tests because direct hiring data such as minor-

35 ity hiring percentage falling outside two to three standard deviations

is just unlikely as a computed statistics falling outside two-to-three standard deviations of a transformed distribution used in hypothesis test. The avoidance of using formal hypothesis tests is to avoid certain failed assumptions. However, to make such a comparison any sense,
5  one really compares the challenged hiring data with population racial composition data to determine whether observed disparity is beyond normal fluctuation.

     After a null hypothesis — the reduced racial minority hiring composition is due to normal fluctuations - is rejected, little can be
10  said about the hiring practice. When statistical method is used to determine the effect of a treatment, one of the steps of testing is to set an alternative hypothesis. Whether rejection of the null hypothesis truly justifies acceptance of the alternative hypothesis depends on the structure of the hypotheses and experiment design. Acceptance of the
15  alternative hypothesis may be proper only when the data is acquired from a well controlled trial so that other effects do not exist. A well known saying is rejecting the hypothesis that a large paw print originated from a bear does not immediately prove the existence of Bigfoot. Hypothesis testing emphasizes the rejection, which is based on a proba-
20  bility, rather than the acceptance. The validity of accepting an alternative hypothesis lies in the control of the experiment from which statistical data are acquired. When data are from uncontrolled sources as in employment cases, an alternative hypothesis cannot be validly proposed.

25       To show the problem by an example, different performance scores for different races in employment tests or different racial compositions can be caused by any of those alternative hypotheses that (1) an employment test is bias against candidates of a particular race, (2) candidates of the race were impaired by a week-long social festival,
30  (3) candidates of the race lack incentive due to sudden availability of high-pay other jobs, or (4) candidates of the race regarded test cheat as a prohibited conduct while other races do not. Those factors may not be included in normal fluctuation, and they can appear as a factor affecting challenged hiring composition. For a hypothesis test using data
35  from uncontrolled sources, after the null hypothesis is rejected, the

conclusion would depend upon the alternative hypothesis even though the
data are exactly same. That is precisely why data for statistical anal-
ysis are normally collected from controlled studies. When hiring data
are from uncontrolled sources, experiment designers must use similar
5   test subjects and throw out data that do not fit into the class (e.g.,
who lack motivation, those who have a cheat history, those who have
high pay jobs, and those who are habitually drunk). A comparison can
only lead to rejection of the null hypothesis. Only if the trial is
controlled, can we accept an alternative hypothesis that hiring dispar-
10  ity is caused by the treatment. Therefore, proving discrimination can-
not be done by statistical method.

       The fallacy of using statistical proof in an employment case is
due to the requirement that the challenged employment practice is fa-
cially neutral. This requirement has resulted in another flaw in using
15  statistical proof to prove a discriminatory impact. The court often
said that employment practice is one that is facially neutral. This re-
quirement is to ensure that employment data would be complete and im-
partial. By applying this requirement, an alternative hypothesis must
be that the employment practice has a disparate impact but could not be
20  seen by applicants. This constraint leaves litigants with very few
choices of alternative hypothesis. Most of intentional discriminatory
conduct could not fit into it. After the null hypothesis is rejected,
class members would end up with no alternative hypothesis that the em-
ployment practice is somehow discriminatory. The logic structure in
25  statistical proof is self-contradictory.

       The only residual trust left from the statistical proof is that
challenged hiring data reflect reduced racial minority composition rel-
ative to population data and thus it must have a disparate impact. Even
this evidence is also flawed for being **post hoc theorizing**. In statis-
30  tics, hypotheses suggested by data, if tested using the data set that
suggested them, are likely to be accepted even when they are not true.
This is because data selection is bias: something seems true in the
limited data set, therefore we hypothesize that it is true in general,
therefore we improperly test it on the SAME limited data set, which
35  seems to confirm that it is true. In statistics, unlike events do hap-

pen at small probabilities. Outcomes falling outside of 3 standard dis-
tributions do happen at low probabilities. When a minority member sees
such an outcome, and seizes it. Without including additional data, the
member always proves it. By using this flawed method, a million employ-
5   ment hiring processes could result in 50,000 false disparate impact
claims each year.
(b) The Statistical Model Has Two Categorization Effects and Improperly
Incorporate Thirty-Party Activities to Disparate Impact Analysis.

    Statistical disparity proof has no utility to prove or disprove
10  discrimination, it has two types of "categorization affects" which can
be traced back to the Castaneda's model which classifies all job appli-
cants into qualified and thus they can be selected by drawing. This se-
lection method is totally contrary to the employee selection method.
Employment decisions are ordinarily made in small batches, and thus,
15  whether a racial minority member is discriminated can be determined
only by comparing his qualification with those of who are hired or lat-
er hired. It cannot be made by comparing with hypothetical employees in
a hypothetical population.

    The two side-effects are shown by using the Hazelwood data. The
20  class members in Hazelwood are assumed to possess different skill lev-
els from the best to the worse. If a 5.6% was used as population racial
composition, the court could deny remedy to all class members even
though some of the class members were better than some of hired employ-
ees and they were denied precisely because of their races. The Castane-
25  da model played a role of denying remedy that has been granted by the
Congress. In a worse case, the dismissal of the class action may be due
to the use of the wrong model and wrong population composition data,
and may result in gross injustice to all class members. In contrast, if
the 15.6% was used as population racial composition, all class members
30  would receive a remedy. Among the class members, some class members
might have been rightfully rejected because they were less qualified
than the hired within their respective application batch. In a worse
case, allowing the class action may give a windfall gain to all class
members who were properly rejected for being less competitive in their
35  respective application batches. Statistical disparity may give remedy

to undeserved class members and deny remedy to deserved class members.

The two categorization effects can be further amplified by fluc-
tuation-contributing factors on population statistical data. The ef-
fects of those factors cannot be undetected, and always affect both

5  plaintiffs and defendants' rights unpredictably. The holding in Hazel-
wood is conclusive evidence that true population racial composition
cannot be determined. The issues identified in Hazelwood imply that
even minority preferences to different districts could change the popu-
lation composition. The need for considering this fact is equivalent to

10 acknowledging unlimited unpredictable factors can affect the outcome
through the statistical model. A large number of factors can change mi-
nority applicants' geographic preference and actual hiring data in sur-
rounding localities. Exemplar factors include racial mixture of resi-
dents, discriminatory reputation of local residents, business entities,

15 and local governments, racial tension in the hiring locality and sur-
rounding localities, school's reputation in managing racial issues,
residual impacts of racial related policies, perceived minority safety
in a hiring locality, and even news and stories posted in the internet
about racial issues could change minority's desire to seek jobs in dif-

20 ferent localities. Any factor which has absolutely nothing to do with
the employer conduct can control its liability through the effects of
their conduct on the minority members' desire to seek jobs in the hir-
ing locality and surrounding localities. In most of the time, the fac-
tors of affecting population racial data are unknown. This point has

25 been addressed in Hazelwood, where the use of hiring policies in St.
Louis city to increase minority teachers would raise racial minority
composition in the area (as population racial composition). This in-
creased area racial population value would increase the difference be-
tween the challenged racial composition and population racial composi-

30 tion measured by standard deviation, and thus affirmatively supports
Hazelwood's liability. The merit of a case between two parties would
depend upon what other persons, entities and governments do, think and
write about. The application of the statistical model results in unpre-
dictable results.

35      The misapplication of Castaneda is directly responsible for the

unenforceable Title VII in disparity impact cases. By employing irrele-
vant, frivolous, target-oriented and discriminatory criteria such as
test scores, composite indexes, or preference rankings, employers not
only can exclude the most qualified minority applicants and but also
5  transfer the fault to the victims. As demonstrated in the dismissal of
this case, the application of Castaneda in employment cases plays a
critical role of shielding Title VII violators and thus makes the cur-
rent adjudication process unconstitutional for violating the due
process of law.

10      The purpose of allowing statistical proof is not to impose a
stringent pleading rule but a relaxing standard that class members
could offer in pleading. Class members are not required to allege dis-
criminatory cause, intent, and precise mechanism. Such a low threshold
pleading standard would give an effected minority an opportunity to
15  maintain a suit. Contrary to a need to lower pleading burden on plain-
tiff, the trial court used it to create an absolute immunity for Title
VII violators.

    (c). Statistical Proof's Specific Problems in e-Discovery Employment

    All problems appear in the employment in e-discovery. (1) No em-
20  ployment would publish applicants' racial statues and hiring data; (2)
random drawing model does not reflect the competitive selection model;
(3) true standard deviation for any hiring batch is be known; (4) hir-
ing data size is too small for statistical analysis (4) hiring data
from different batches cannot be pooled (see the data in Hazelwood);
25  (5) two categorization effects exist. Due to page limit, Appellant only
discusses problems in pooling data and collecting impartial data.

    As shown in Hazelwood data in Table 1, the pooling hiring data for
two-year period can increase "disparate impact" measured by standard
deviation. Any hiring data acquired for different periods or from dif-
30  ferent firm cannot be pooled. There are many other reasons for prevent-
ing pooling data.

    A statistical proof of a disparate impact requires unbiased and
complete testing and hiring data for determining fluctuations. The data

    ALTA testing discourages some racial minority from applying for

foreign language review jobs. When hiring data are bias or incomplete, the data cannot be used to prove or disprove a discriminatory impact. In employment, racial minority candidates avoid applying to employers that are openly discriminatory, have insulted racial minority, or have
5  a known discriminatory reputation. Any facially discriminatory practice can discourage minorities from applying jobs. As a result, hiring data that have been affected by discriminatory practice cannot be used in statistical analysis or statistical trial.

The complaint alleges that demanding Plaintiff to pass Chinese
10  language test is exactly same as demanding American lawyers to pass an English test created and administered by non-English foreigner (such as a Chinese translator) as an employment prerequisite. Due to the incompetency of the tests, compounded errors, and wrong design, ALTA test can "grade-up" those who do not has language skills and "grade-down"
15  those who have expert language skills. The employment practice is as insulting as ranking America-born attorney's English skills below those who have just learned English for several months in a foreign culture. The test may also force candidates to walk away from the test for other reasons. Some may avoid taking an ALTA test because they know that the
20  test would be same, and some may avoid the test because they avoid getting into the cloud of violating ethical rules for participating in the test fraud.

On the other hand, ALTA testing, due to uncontrolled nature and reuse of the tests, must have attracted candidates who simply do not
25  have required qualifications and language skills. One can reasonably predict that a candidate pool formed by using ALTA tests would have increased population of candidates who are deceptive, incompetent, unethical, risk-taking, and persistent, but will have fewer candidates who are competent, honest, and ethical. Thus, the test data and employment
30  data are not drawn from available and qualified candidates. Such data cannot be used for any kind of analysis.

The requirement of statistical disparate proof becomes a powerful judicially created immunity, any employer can use an employment practice including interview, employment test, drug screening, or con-
35  flicting screen to achieve discriminatory purposes and then withhold

hiring data and racial data. The employers can expect nothing can hap-pen. This Court should ban its use in employment cases.

**4. Pleading Rule Constructed by Extending <u>McDonnell Douglas</u> to <u>Mayor</u> Is Consistent with All Supreme Court's Precedents, Title VII, and Employment Realty.**

5
For a disparate impact action arising from employment involving special skills, Plaintiff offers a pleading rule which can be readily constructed by extending <u>McDonnell Douglas'</u> rule to <u>Mayor</u>'s qualifica-tion-analysis (See <u>McDonnell Douglas v. Green,</u> 411 U.S. at 411 U. S.

10
800 at 802) in the following steps: (1) <u>Teamster</u>, <u>Hazelwood</u>, and <u>Mayor</u> rejected statistical proof; (2) <u>McDonnell Douglas</u> pleading rule serves as the basic rule; (3) <u>Griggs</u> prohibits employers from using bogus, and tenuously relevant qualifications to replace the most relevant qualifi-cations, and thus requires the striking of test scores or rankings

15
tainted by discriminatory policies out of qualification analysis; and (4) <u>Mayor</u> requires that employer select candidates by using relevant qualifications.

The combination of those precedents inevitably results in the following pleading rule: A member of a racial minority group, had

20
sought a job for which there was a vacancy, has been rejected or dis-qualified by criteria, ranking, or preference scores impaired by a dis-criminatory policy, device or process, and for which the employer con-tinued thereafter to seek applicants with similar, or lower, or irrele-vant qualifications. Such a pleading rule provides the inference that

25
the minority applicant was denied of an employment opportunity as a re-sult of using the discriminatory policy, device, or process prohibited by Title VII. The burden then shifts to the employer to rebut that in-ference by offering some legitimate, nondiscriminatory reason for using the challenged policy, device or process and the class member would

30
have their term to show whether a better alternative method could be used to achieve legitimate purposes.

By accepting the above pleading rule, class members should be allowed to prove their disparate impact claims by showing (1) rejecting qualified candidates while they continue to seek similar or less quali-

35
fied candidates, (2) placing qualified candidates in a blacklist as a result of implementing discriminatory policy and practice while solic-

iting similar or less qualified candidates, (3) giving up the effort to fill job vacancies due to "lack" of racially desirable candidates while refusing to hire wrongfully disqualified minority members, or (4) se-
lecting less qualified majority members over more qualified minority
5    members if the minority members can show that any fair minded employer would have selected the minority members had the racial identities of the minority members been undisclosed.

This proposed proof rule is a natural and inevitable result from reconciling <u>Griggs</u>, <u>Mayor</u>, <u>Teamster</u>, <u>Hazelwood</u>, and <u>McDonnell Douglas</u>
10   for disparate claims involving special qualifications. This pleading rule is fully consistent with the intended purpose of Title VII and the reality that employees are selected by competitive relevant qualifica-
tions.

**C. Using ALTA Test Scores to Select Foreign Document Reviewers Has Def-**
15   **inite Adverse Impact on Native Speakers, As Shown by Simulations**
The trial court's finding of no disparity impact is not based on any alleged facts. The trial court reached this conclusion without even discussing any critical allegations: (1) the flaws of the ALTA language test and its bias to native speakers while native language
20   skill is the most relevant job skill, (2) the control role of the fault test scores, (3) the reason of rejecting Plaintiff being his low test score, and (4) the repeated and perpetual rejections as a result of placing Plaintiff in the defendants' blacklists solely for his low test scores or refusal to retake the test.

25       Instead, the trial court conducted an analysis contrary to com-
mon sense. The trial court seized Plaintiff's inability to allege that the ALTA test excluded all native speakers from the jobs. It is clear that deception, luck, and incompetency are the most critical feature of the ALTA tests. For such obvious reason, ALTA testing would never stop
30   anyone who is determined to get the job by any means. Thus, some native speakers can achieve high scores by repeating tries, luck, and cheat-
ing. The trial court cannot use this factor to legalize such a sandal. Even a random drawing and all-cheating game still has huge adverse im-
pact on native speakers. Their odd for them to get job in their lan-
35   guages would be reduced from a near certainty to near zero, whole can-

didates from other national origins would improve odd from an absolute zero to something. By using such flawed scores, all native speakers will gradually be eliminated from the work force requiring their languages, as shown by the simulation. In addition, the trial court should
5  not condone such vicious test competition, which would progressively increase the ratio of incompetent, deceptive, and lucky employees in the discovery force. A federal court with a constitutional duty to adjudicate controversies should not leave the sandal as it is simply because Plaintiff was free to do the same. Those things can forever in-
10  jure Plaintiff by the time the test is exposed as a scandal of the century.

The trial court demand's for statistical proof is inconsistent with the reality that published, impartial and complete ALTA test performance data and hiring data do not exist, and true qualified and
15  available racial composition cannot be determined. Thus, the only method consistent with clearly establish scientific principles is to conduct simulation. To prove the error in the trial court's opinion, Plaintiff now conducts simple simulations, as the best proof possible, to show disparate impact.
20      It is assumed that there are three groups of candidates: second language speakers (SLS), America-born candidates (ABC), and true native speakers. The basic assumptions are (1) the language skills of native speakers are better than those of other groups of candidates; the native speakers comprise a small population; and replacing candidates
25  comprise largely native Americans. The result of simulation is shown in Table 3.

Table 3. Adverse Effects of ALTA Score-Based Selection Method on Native Speakers

| Classes | Second Language Speakers | America-born Speakers | Native Speakers | Total |
|---|---|---|---|---|
| Key Class Character | Limited language skill | Limited language skill | > College (>15 Years) | |
| Population | 50 (50%) | 25 (25%) | 25 (25%) | 100 |
| Griggs Rule | 0 (0%) | 1 (10%) | 9 (90%) | 10 |
| ALTA Score | 3 (30%) | 4 (40%) | 3 (30%) | 10 |
| Impact | (+30%) | +30% | -60% | |

By following the <u>Griggs</u> Rule and <u>Mayor</u> special qualifications, a largest number of native speakers would be selected. By using similar selection standard used in English review, only exceptional second lan-
5 guage speakers and exceptional America-born candidates could be select-ed. By using ALTA test scores as a determinant selection criterion or ranking scale, only those high scorers are selected. Some second lan-guage speakers and American-born candidates are selected simply because they achieve better test scores and thus gain more spaces. Native
10 speakers lose 60%, thus experiencing a disparate impact. Those selected native speakers are those who can achieve high scores for whatever rea-sons. The cause of the disparate impact is that true language skills are replaced by fault ALTA test scores that do not measure true lan-guage skills and that anyone can "achieve."

15 The numbers in the table are arbitrary. However, the purpose is not to show degrees of impact just as the statistical method. Simula-tion can prove cause without using circular logic. This is used to as-certain the effects. However, the method can show that virtually unlim-ited potential numbers or combinations consistent with the assumptions
20 will support the same conclusion: native speakers were replaced by less competent or even language-"blind" higher ALTA scorers. Native speakers suffered an adverse impact because required qualifications are replaced by scores that comprise the contribution of fraud, luck, incompetency, and bias. The proof is superior to statistical proof because it speci-
25 fies the cause that would never be proved by the statistical method.

From the above analysis, disparate impact also arises as a result of replacement of qualified native speakers by mismatched native speakers. Language skills required for reviewing documents is far more than what is required for entertaining news and cultural understanding. It is far
30 more than the ability to recognize a few thousands of words. When docu-ments are created in a foreign language by foreigners for a foreign business, the documents are intertwined with foreign culture. Consider-ing corporate documents, some obvious classes of comprehension barriers are human names, business names, city/town/location names, foreign cal-
35 endar, foreign numeral system, foreign money system/pricing, government

structures, legal system type, court system, tax system, employment
practices, unique expressions, famous events, famous persons, and fa-
mous books. Many those classes of terms may comprise a gigantic number
of individual information pieces. An ability to recognize and distin-
5    guish just three classes terms - human names/genders, location names,
and foreign business names cannot be developed without a long exposure
to the native culture. English-speakers in North America, Hong Kong,
Singapore, and India may share the same vocabulary, but a native speak-
er from one culture is presumed to know little about each class of
10   those terms used in other remote cultures. A native American reviewer
cannot competently review Indian invoices unless the reviewer can rec-
ognize India business names, Indian people names/sex, place/location
names, the distances between locations, transportation means/lodging
facilities, money system, invoicing practices, and normal and abnormal
15   spending in various situations in light of the cultural norms and busi-
ness practices. Determining whether an invoice is real, deceptive, or
reasonable, is not as easy as memorizing five thousands of words. Docu-
ment reviewer for this simple task needs to know tens of millions of
things before they could make a sound judgment. A review team compris-
20   ing reviewers of a wrong national origin could systematically misunder-
stand same facts or phenomena in the entire review. It is crazy idea
that a person with limited second language skills can competently un-
derstand documents in litigation involving huge stakes and risks. Se-
lecting candidates by using ALTA tests has caused staffing agencies to
25   select a whole team of candidates who simply do not know a gigantic
amount of information that is not found in dictionaries, and pose un-
reasonable risks to the end client's cause.

          Plaintiff can also prove that ALTA testing can eliminate all na-
tive speakers from foreign language review jobs. Assuming that foreign
30   language reviewers are selected by random drawing, Plaintiff can show
with certainty that such a selection method will eventually "eliminate"
all native speakers" from the employment. The assumptions are (1) na-
tive speakers have superior language skills for reviewing foreign docu-
ments of their national origin, (2) native speakers comprise a small
35   population, and (3) potential replacement candidates comprise a much

larger population. A disparate impact can be shown in the following ta-
ble.

Table 4. Adverse Effects of Random Drawing on Native Speakers

| Classes | Second Language Speakers | America-Born Candidates | Native Speakers | Total |
|---|---|---|---|---|
| Key Class Character | Limited Language Skills | Limited Language Skills | > College (>15 Years) | |
| Population | 4680 (93.60%) | 300 (6.0%) | 20 (0.40%) | 5000 |
| Griggs Rule | 0 (0%) | 1 (10%) | 9 (90%) | 10 |
| Draw, p=0.002 | 9 (90%) | 1 (10%) | 0 (0%) | 10 |
| Impact | (+90%) | No change | -90% | |

5      Native speakers are the most qualified candidates who would be
selected under the Griggs and Mayor rules. However, when reviewers are
selected by random drawing, their true qualifications are ignored. In-
stead, their relative chances to be selected would be the same chance
for everyone in the whole pool. The odd for native speakers to be drawn
10 is dropped from a near certainty to nearly zero, while the odd for the
replacement member is increased from zero to a positive value. As long
as the replacement group is much larger than the native group, native
speakers will be "eliminated" by a drawing method. This disparate im-
pact is beyond challenge as long as those assumptions are held. The
15 only differences are degrees of impact, which depend upon relative
sizes of the native group and the replacement group. This is exactly
the case where the most qualified candidate is replaced by a know-noth-
ing candidate. The trail court's holding is contrary to reality and de-
fies common sense.

20     Those simulations show how the ALTA testing harmed protected
groups. The ALTA testing has harm minority candidates in practically
all languages. The proof of disparate impact is far stronger and more
convincing than flawed statistical disparity proof which is close to
playing lottery. As to Plaintiff's personal damages, Plaintiff suffered
25 actual adverse impact, was replaced by those who simply lacked required
qualifications, and was placed on defendants blacklists for repeating
and perpetual injury.

**D. Using ALTA Test Scores to Select Foreign Language Reviewers Has Def-**

**inite Adverse Impact on Old-and-Experienced Reviewers, As Shown by Simulation**

The trial court's finding of no age disparity impact is contrary to reality and defies common sense. The trial court reached this con-
5   clusion without even discussing those critical allegations: (1) the flaws of the ALTA language test, (2) the control role of the fault test scores, (3) the sole reason of rejecting Plaintiff being test score, (4) the repeated and perpetual rejections as a result of placing Plaintiff in the defendants' blacklists solely for his low test scores or
10  refusal to retake the same test, and (5) rejecting him for English review projects which do not require test scores.

The trial court made this finding by attacking the wording of a few allegations. Plaintiff implied that some protected members get high scores and get review jobs. After the most relevant language skill is
15  replaced by the scores of uncontrolled and frivolous ALTA tests, anyone can achieve any scores to land on foreign language document review jobs. Thus, ALTA test would never exclude all old and experienced candidates because it did not prevent anyone from repeating tries, cheating in test, and cracking tests. By attacking this, the trial court
20  seems to hold that native speakers' inability to find jobs in their languages is their own choosing. Dismissing the case for this reason is same as approving the scandalous test on the ground that it gave the same chance to protected members.

The trial court failed to realize potential consequence from
25  taking test practice. If the competition forces all required candidates to achieve high scores, the only way to get a job is to achieve higher or highest score. The only way to get top scores for incomprehensible tests is retaking test, collaborate with others, and cracking tests. This may force some candidates to do what others do. Plaintiff would
30  have to do the same to get jobs. However, this is unacceptable risk to Plaintiff. The trial court's refusal to invalidate this ALTA test is same as condoning all alleged misconduct. Deceptive, incompetent and mismatched reviewers mentioned in the complaint can stay on such jobs. This is due to flowed performance metrics or practical difficulties to
35  evaluate reviewer performance. As shown in some cited allegations, language "blind", Google users, and high school students can meet daily

review quota and achieve acceptable "error rates."

Plaintiff cannot prove disparate impact by using statistical method due to lack of testing data, lack of hiring data, and overwhelming problems, and cannot use straight percent comparison due to hiring
5   data fluctuation. However, Plaintiff will prove disparate impact under Age Discrimination in Employment Act by simulation.

One simple data simulation is conducted to show disparate impact on age. This simulation is conducted on the basis of three groups of candidates: No experience, 1 to 10 years (an unprotected group), and 10
10  or more years (a protected group). Assumptions used are that review experience is the most proper qualification for document review job; a relatively large percentage of candidates stay in the field in their normal career paths; ALTA tests do not measure true language skills; and review experience is highly relevant. Each of the assumptions can
15  be proved at trial. A simulation result is shown in Table 3.

Table 3. Adverse Effects of ALTA Score-Based Selection Method on Old and Experienced Candidates

| Age Groups | Primarily Young | Unprotected Group | Protected Group | Total |
|---|---|---|---|---|
| Experience Level | None | Limited Exp. (1-10 yrs) | Great Exp. (> 10 yrs) | |
| Population | 30 (30%) | 30 (30%) | 40 (40%) | 100 (100%) |
| Griggs Rule | 2 (20%) | 4 (40%) | 4 (40%) | 10 |
| ALTA Scores | 8 (80%) | 1 (10%) | 1(10%) | 10 |
| Impact | (+60%) | -30% | -30% | |

Specific cause for age disparate impact is definite. By using
20  the Griggs and Mayor rules, experience must be considered especially when pay rate does not depend upon experience level. In the challenged employment practice, experience is replaced by candidates' ability to "achieve" highest test scores. Highly qualified candidates are less likely to engage in retries, collaboration, and acquisition of prior
25  tests for achieving high scores. The specific cause for disparate impact is ALTA testing did away with experience from selection criteria, while the test gave unqualified, mismatched, incompetent, deceptive, and luck-seeking applicants a nothing-to-lose opportunity. The dis-

parate impact on the protected group is -30%, the impact on new candidates is +60%. The existence of a disparate impact on an unprotected group does not negate disparate impact on a protected group. Multiple impacts can exist in one single hiring practice. Using a drawing device

5   can simultaneously affect both most qualified native speakers and the old-and-experienced candidates. New graduates may replace native and old and experienced reviewers.

### Conclusion

Plaintiff requests the judgment to dismiss the case be reversed.

10

Dated: March 15, 2015

Respectfully submitted,

/Jianqing Wu/

_____

15   Jianqing Wu, Plaintiff
3304 Rutgers Street
   Hyattsville, MD 20783
202-459-9199
jwu9999@gamil.com

20

25

30

35

## CERTIFICATE OF COMPLIANCE WITH FONT REQUIREMENT

I hereby certify that this brief contain 11804 words in total. It is printed in mono-spaced font with 10.5 characters per inch. The text
5   that is subject to limit has 950 lines from page 7 to page 37.

/s/
JIANQING WU

10

15

20

25

30

35

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing doc-
ument was served by email and first class mail, postage prepaid, to the
5   following persons and parties on 16th day of March, 2015. Plaintiff and
those parties accepting email services have reached an agreement on mu-
tual email service.

                        /s/
10                    JIANQING WU

Ms. Jennifer Feldman
Smith, Gambrell & Russell, LLP
Attorney for Special Counsel
1055 Thomas Jefferson St, NW,
Suite 400
Washington DC, 2007
Served by Email to:
jfeldman@sgrlaw.com,
YDave@sgrlaw.com,
SBRUST@sgrlaw.com

Mr. Mike Murphy
Ogletree, Deakins, Nash,
Smoak & Stewart, P.C.
Attorney for Morrison Foerster
1909 K Street, Suite 1000
Washington, DC 20006
By first class mail

Mr. Mike Murphy
Attorney for Hire Counsel
Ogletree, Deakins, Nash, Smoak
& Stewart, P.C.
1909 K Street, Suite 1000
Washington, DC 20006
Served by first class mail

Mr. Joseph G. Gosby
Butzel Long PC
Attorney for ALTA
1747 Pennsylvania Ave, N.W.
Suite 300
Washington DC 2006
Served by Email to:
jferdinand@fisherbroyles.com
Cosby@butzel.com,
mpatel@fisherbroyles.com

Ms. Elizabeth Bower
Willkie Farr & Gallagher LLP
1875 K St NW #100
Washington, DC 20006
Served by email to:
EBower@WILLKIE.COM